<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GARDEN ACADEMY,<br><br>      Plaintiff,<br><br>      v.<br><br>S.M. AND E.M. ON BEHALF OF B.M.,<br><br>      Defendants. | Civil Action No. 19-20655 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

      This matter comes before the Court upon cross-motions for summary judgment. The first is the Motion for Summary Judgment brought by Defendants S.M. and E.M. (the "Parents"), the legal guardians of their now adult child, B.M. (ECF No. 15.) The second is the Motion for Summary Judgment brought by Plaintiff Garden Academy ("Garden Academy"). (ECF No. 16.) Garden Academy opposed the Parents' motion (ECF No. 19) and the Parents replied (ECF No. 21). Likewise, the Parents opposed Garden Academy's motion (ECF No. 20) and Garden Academy replied (ECF No. 22). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Parents' Motion for Summary Judgment is granted in part and denied in part, and Garden Academy's Motion for Summary Judgment is denied.

## I.      BACKGROUND

### A.      Statutory Overview

Through the Individuals with Disabilities Education Act ("IDEA"), the federal government provides funding to assist states with educating disabled children living within their borders. *See* 20 U.S.C. §§ 1400, *et seq.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014).  States receiving these funds must adopt a set of policies and procedures meant to guarantee all disabled children receive a free appropriate public education ("FAPE"). 20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267-68.  The Individual Education Plan ("IEP") is the "primary mechanism for delivering a FAPE." *Ridley Sch. Dist. v. M.R. ex rel. E.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citations and internal quotation marks omitted).  Under the IDEA, "school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student." *Ridley*, 680 F.3d at 269; *see also* 20 U.S.C. § 1414(d)(1)(B).

"Should a dispute arise as to a student's education, the IDEA provides for an 'impartial due process hearing.'" *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 610 (E.D. Pa. 2008) (quoting 20 U.S.C. § 1415(f)).  "Congress has chosen to legislate the central components of due process hearings." *Schaffer ex rel. Schaffer*, 546 U.S. 49, 54 (2005) (listing components such as the right to "present evidence and confront, cross-examine, and compel the attendance of witnesses" (quoting 20 U.S.C. §§ 1415(h)(1)-(2))).  Additionally, Congress has provided that during the pendency of due process proceedings, "unless the [s]tate or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136, 139 (3d Cir. 2013).  "This provision represents Congress's policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with

2

regard to their placement is ultimately resolved." *Id.* The so-called "stay-put" provision "protects the status quo of a child's educational placement by preventing 'school districts from effecting unilateral change in a child's educational program.'" *Id.* at 139-40 (quoting *Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S.*, 96 F.3d 78, 83 (3d Cir. 1996)) (internal quotation marks and citations omitted).

Notwithstanding the fair hearing procedures mandated by federal law, Congress gave state authorities the "responsibility generally for establishing fair hearing procedures." *Schaffer*, 546 U.S. at 54. Section 1415(a), "entitled 'Establishment of procedures,' . . . requires state and local educational agencies to 'establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]' by these agencies." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 609 (3d Cir. 2015) (quoting 20 U.S.C. § 1415(a)).

Pursuant to Congress's command in Section 1415(a), New Jersey has enacted its own "stay-put" rule. That rule "provides in relevant part that 'pending the outcome of a due process hearing, including an expedited due process hearing, or any administrative or judicial proceeding, no change shall be made to the student's classification, program[,] or placement unless both parties agree.'" *R.K. ex rel. R.K. v. Ridgewood Vill. Bd. of Educ.*, No. 16-5019, 2016 WL 4443165, at *4 (D.N.J. Aug. 18, 2016) (quoting N.J. Admin. Code § 6A:14-2.7(u)); *see also* N.J. Admin. Code § 6A:14-2.6(d)(10) (providing that "pending the outcome of mediation, no change shall be made to the student's classification, program[,] or placement, unless both parties agree"). "In essence, the New Jersey regulatory provision . . . requires the same stay put requirement as the IDEA." *R.K.*, 2016 WL 4443165, at *4. Importantly for the motions currently before the Court, Chapter Fourteen of Title 6A of the New Jersey Administrative Code setting forth the State's

3

special education regulations "apply to all public and *private* education agencies providing publicly funded educational programs and services to students with disabilities." N.J. Admin. Code § 6A:14-1.1(c) (emphasis added).

## B.   Factual Background

Garden Academy is a private special education school serving students with autism spectrum disorders. (Parents' Statement of Material Facts ("PSMF") ¶¶ 34-35, ECF No. 15-3; Garden Academy's Response to Parents' Statement of Material Facts ("GARPSMF") ¶¶ 34-35, ECF No. 19-1; ALJ Op. JA10-11, Joint App. Vol. I, ECF No. 15-4 ("ALJ Op.").) S.M. and E.M. are the parents and legal guardians of B.M., a severely developmentally disabled adult who was at all times relevant eligible for special education and related services under the IDEA. (PSMF ¶¶ 1-3; GARPSMF ¶¶ 1-3; ALJ Op. JA10-11.) In 2007, before his tenth birthday, B.M. was placed at Garden Academy "pursuant to a series of [IEPs] agreed to by B.M.'s parents and the Marlboro School District [("Marlboro")]." (ALJ Op. JA10-11; PSMF ¶ 8; GARPSMF ¶ 8.) "B.M. had been classified by the child study team of Marlboro as eligible for special education and related services under a diagnosis of autism." (ALJ Op. JA12; PSMF ¶ 1; GARPSMF ¶ 1.)

According to testimony from B.M.'s father, during B.M.'s first year at Garden Academy, from 2007 to 2008, B.M.'s "teacher came out to the house once a week to work with B.M. to generalize his skills in areas such as toilet training and his lessons. During his second year, 2008-09, his teacher . . . came out more often, sometimes as much as three times a week."[1] (ALJ Op. JA18 (citing S.M. Dec. 17, 2018 Hr'g Tr. 22:3-23:17, Joint App. Vol. VII, ECF No. 15-11); *see also* ALJ Op. JA16 (describing testimony from Lauren Sinning, a Garden Academy staff member

---

[1] B.M.'s father also testified that his son had received "home services under the IDEA" as early as "two to three" years old. (ALJ Op. JA18.)

4

who "identified home-programing logs . . . which showed that the programming for B.M. occurred in various places, including his home during the 2007-2008 year"). Garden Academy acknowledges that during the 2008 to 2009 school year, "home programming increased" to as much as fifty to seventy-five annual home visits by Garden Academy staff. (PSMF ¶ 21 (citing S.M. Dec. 17, 2018 Hr'g Tr. 59:17-25); GARPSMF ¶ 21.) It is also undisputed that on April 7, 2008, the Parents and other members of the IEP Team enacted an IEP whose text provided that B.M. was to receive "home visits." (*See* PSMF ¶ 17 (quoting Apr. 7, 2008 IEP JA610, Joint App. Vol. III, ECF No. 15-6); GARPSMF ¶ 17.)

On March 26, 2009, the Parents and other members of the IEP Team agreed to a new IEP. In the "Developmental and Functional Performance" section, the March 2009 IEP provided that "[h]ome parent training is included as part of [B.M.]'s program at Garden Academy and involves once weekly visits by either [B.M.]'s teacher or teacher's aide" for "approximately two hours." (ALJ Op. JA12 (quoting Mar. 26, 2009 IEP JA344, Joint App. Vol. III); PSMF ¶ 18; GARPSMF ¶ 18.) According to the ALJ, the March 2009 IEP discussed B.M.'s "difficulty with generalizing skills in the home, riding appropriately in a vehicle, and even keeping on his clothing, noting that 'home programming and training' would continue in those areas." (ALJ Op. JA12.) "Additionally, some of his goals and objectives in that same IEP targeted behaviors that usually take place in the home such as laundry, dental care, and showering." (*Id.*) The ALJ also found that although the Parents had "requested more home visits at the March 2009 IEP meeting, Garden [Academy] was opposed, and the final IEP only contained a provision for home programming to include at least once-weekly visits." (*Id.* at JA19.)

According to the ALJ, notwithstanding the March 2009 IEP, "Garden [Academy] unilaterally ceased the training in the home and notified [the Parents] that the home-programming

5

component of the IEP would take place at Garden [Academy] instead." (ALJ Op. JA13; PSMF ¶ 52; GARPSMF ¶ 52.) The ALJ heard testimony from the now former Garden Academy Director, David Sidener, Ph.D., that because "Garden [Academy] staff felt that the home visits were not enough to deal with B.M.'s increasingly alarming behaviors in mid-2009, he made a decision to move the training to a more structured environment at the school." (ALJ Op. JA14; Garden Academy's Statement of Material Facts ("GASMF") ¶ 34, ECF No. 16-1; Parents' Reply to Garden Academy's Statement of Material Facts ("PRGASMF") ¶ 34, ECF No. 20-1.) Accordingly, "[d]uring the summer of 2009, Garden had changed B.M.'s teacher and the home visits stopped." (ALJ Op. JA14; PSMF ¶ 52; GARPSMF ¶ 52.) "Sidener then directed [the Parents] to attend a full week of parent training in August." (ALJ Op. JA14; GASMF ¶¶ 26-27; PRGASMF ¶¶ 26-27.) When "the parents did not attend . . . Sidener then issued [a] September 1[, 2009] letter setting forth his conditions for any further training." (ALJ Op. JA14; GASMF ¶¶ 26-27, 32-36; PRGASMF ¶¶ 32-36.) Among other conditions, the letter specified that the Parents "will come to school for training as requested by the Director" and that the Parents' "signature on this letter indicates [their] . . . willingness to accept the above-stated terms of [B.M.'s] continued enrollment at Garden Academy." (ALJ Op. JA15 (quoting Sept. 1, 2009 Correspondence JA301, Joint App. Vol. II, ECF No. 15-5); GASMF ¶ 36; PRGASMF ¶ 36.) The ALJ also heard testimony from Sinning, the Garden Academy staffer, that while the Parents "were not forced to sign the document . . . their failure to do so may have resulted in their child being removed from the school." (ALJ Op. JA16-17; *see also* Sinning July 10, 2017 Hr'g Tr. 46:11-16, Joint App. Vol. V, ECF No. 15-9 (testifying that the Parents were given an "ultimatum" and had they not signed the letter and agreed to its terms, "they may have been removed from the school").) It is undisputed that "the decision made to cease providing a home program to B.M. in the summer

6

or early fall of 2009 was made without involving B.M.'s local school district." (PSMF ¶ 52; GARPSMF ¶ 52.)

After the September 2009 letter, "the [P]arents came to the school" for the home programming and training and, "at least initially . . . never raised any concern that this was a violation of the IEP." (GASMF ¶ 38; PRGASMF ¶ 38.) Nevertheless, the ALJ credited testimony from B.M.'s father that the Parents remained "concerned over the cessation of home visits." (ALJ Op. JA19.) The ALJ found that "once the home visits had ceased, [the Parents] were forced to seek services from an agency, and presented an invoice from Rainbow Consulting for the costs that they had incurred from October 2009 through December 2010 in the amount of $19,300." (ALJ Op. JA19-20; *see also* GASMF ¶ 44; PRGASMF ¶ 44.) In the opinion below, the ALJ found that from "August 2009 through September 2011 . . . home visits did not occur, with the exception of two instances where Garden [Academy] staff went to the home to assist the family with [B.M.'s] school transport issues." (ALJ Op. JA13.)

## C.   Procedural History

Ultimately, "[o]n November 30, 2009, Sidener sent Marlboro a letter initiating the termination process under [N.J. Admin. § Code 6A:14-7.7]." (GASMF ¶ 40; PRGASMF ¶ 40.[2]) The Parents then "filed a request for mediation on December 8, 2009 challenging the proposed termination." (GASMF ¶ 41; PRGASMF ¶ 41.) "When mediation was not successful, the matter was transferred to the New Jersey Office of Administrative Law [("OAL")]." *S.M. ex rel. B.M v. Marlboro Twp. Bd. of Educ.*, No. 10-4490, 2013 WL 2405438, at *1 (D.N.J. May 31, 2013). The OAL rejected the Parents' request "that Garden Academy be compelled to provide outreach or

---

[2] According to Garden Academy, it sought "termination of the placement for reasons unrelated to the present case." (Garden Academy Moving Br. 2, ECF No. 16-2.)

home-based support services." *Id.* at *2. The OAL found that "services encompassed under the stay-put provisions in this matter did not include a weekly home visit by staff personnel from . . . Garden Academy." *Id.* at *1, *5 (quoting June 3, 2010 OAL Op., Exhibit E to Rubin Decl., ECF No. 27-6).

On September 1, 2010, the Parents petitioned this Court seeking reversal of the OAL's findings and rulings. Among other things, the Parents argued that the OAL had "deni[ed] B.M. protection under the '[s]tay-[p]ut' provision" and that in order to maintain the status quo as required by the stay-put provision, Garden Academy was required to provide once per week home visitations by teachers or teachers' aides as a component of "home programming." *Id.* at *1, *5-6. In a May 31, 2013 opinion, however, this Court found that "at a minimum, there exists a material factual dispute with regard to the meaning of home programming," and thus the Court "remand[ed the case] so that the ALJ can examine the Parties' positions regarding the meaning of 'home-programming' as it relates to the parties' agreements." *Id.* at *6.

On October 26, 2019, the ALJ resolved the remanded factual disputes in the Parents' favor. The ALJ found that "a determination as to what home services or home programming had been agreed upon by the parties for the 2009-10 school year must begin with that year's IEP." (ALJ Op. JA20.) According to the ALJ, "the last-agreed-upon IEP between the parties clearly set out that home visits were to occur 'once weekly by B.M.'s teacher or teacher's aide' for 'home parent training.'" (*Id.*) The ALJ found that "Garden [Academy] changed the terms of B.M.'s 2009-10 IEP by eliminating the mandated once-weekly home visits. It did so without input from Marlboro and without attention to the requirements for amending a child's IEP as set forth in New Jersey regulations governing special education." (*Id.* at JA27 (citing N.J. Admin. § Code 6A:14-7.5(b)(1)(i), 6A:14-2.3, 6A:14-3.7).) The ALJ concluded that "[t]he circumvention of

8

Marlboro, the school district, and the IEP process, along with the failure to validly obtain the consent of the parents," demonstrates "that the IEP was not changed and the requirement in the last-agreed-upon IEP that weekly home visits must occur remained in place during the 2009-10 school year and the period of stay-put." (*Id.* at JA28.) The ALJ ultimately awarded the Parents "223.6 hours of therapy services as compensatory education." (*Id.* at JA31.)

On November 23, 2019, Garden Academy filed the current action seeking to reverse the ALJ's October 2019 decision. (Compl., ECF No. 1.) The Parents have since filed counter-claims. Count One seeks to uphold and enforce the ALJ's October 2019 decision, (Answer and Counterclaims ¶¶ 7-28, ECF No. 5), Count Two seeks "additional relief to which Defendants are entitled," (*id.* ¶¶ 29-32), and Count Three asserts a retaliation claim, (*id.* ¶¶ 33-43). On June 19, 2020, the Parents moved for summary judgment on Counts One and Two of their counter-claims, seeking to both uphold the ALJ's decision and obtain "greater relief than that which was provided for" in the ALJ decision. (ECF No. 15.) The Parents' Summary Judgment Motion also sought to "obtain all the attorney's fees and costs incurred, compensatory education services and any other relief that has been or could be awarded by the Federal District Court."[3] (*Id.*) For its part, Garden Academy cross-moved for summary judgment seeking to vacate the ALJ's decision and dismissing the Parents' counterclaims. (ECF No. 16.)

## II.   LEGAL STANDARD

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, No. 05-4925,

---

[3] The Parents do not seek summary judgment on the retaliation claim alleged in Count Three of their counterclaims. (*See generally* Parents' Moving Br., ECF No. 15-2.)

2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006). Furthermore, "[t]he standard of review under which this Court considers an appeal of a[n ALJ] decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (internal quotation marks and citation omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). The parties' motions, therefore, "[a]lthough framed as . . . motion[s] for summary judgment, . . . [are] actually . . . appeal[s] of the ALJ's ruling," *G.S. ex rel. B.S. v. Cranbury Twp. Bd. of Educ.*, No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), and the Court will "essentially conduct[ ] a bench trial based on a stipulated record." *M.S. ex rel. D.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007).

When deciding an IDEA case, the district court "applies a modified version of de novo review and is required to give due weight to the factual findings of the ALJ." *L.E. ex rel. M.S. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Factual findings from administrative proceedings are to be considered prima facie correct. If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *S.H. ex rel. I.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (internal quotation marks and citations omitted). "The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 271. An ALJ's legal determinations, on the other hand, are reviewed de novo. *Moorestown Twp. Bd. of Educ. v. S.D. ex rel. M.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). "Applying these standards, the district court may make findings 'based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private

10

educational placement, and a direction for the provision of a compensatory education.'" *Id.* (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).

## III.    DISCUSSION

### A.    Applicability of the IDEA and New Jersey Special Education Regulations to Private Schools

Garden Academy's moving brief raises the threshold question of whether the IDEA "authorizes a compensatory education award against a private special education school that has agreed to accept placements from public school districts." (Garden Academy's Moving Br. 7.) According to Garden Academy, "[n]o decision in this jurisdiction has ever recognized an IDEA-based claim against a private school, other than for harm resulting from the school's violation of IDEA's procedures specifically applicable to out-of-district receiving schools." (*Id.*) Referring to IDEA and New Jersey special education provisions such as the "stay-put" and IEP amendment requirements, Garden Academy argues that "the duty to implement IDEA's mandates rests entirely and exclusively upon . . . public agencies. There is no provision imposing upon a private entity the obligation to ensure compliance with the IDEA." (*Id.* at 12.)

As discussed above, however, Congress has authorized states "to 'establish and maintain procedures in accordance [with the IDEA] to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]' by these agencies." *G.L.*, 802 F.3d at 609 (quoting 20 U.S.C. § 1415(a)). Pursuant to Section 1415, education officials in New Jersey have promulgated special education regulations protecting the rights of disabled students to a FAPE. These safeguards include that "[p]ending the outcome of a due process hearing . . . or any administrative or judicial proceeding, no change shall be made to the student's classification, program, or placement unless both parties agree, or emergency relief as part of a request for a due process hearing is granted by the [OAL]." N.J. Admin. § Code 6A:14-

11

2.7(u); *see also* N.J. Admin. Code § 6A:14-2.6(d)(10) (creating a similar "stay-put" provision for disabled students pending the outcome of a student's requested mediation to resolve disputes regarding identification, evaluation, classification, educational placement, or the provision of a free, appropriate public education). Education officials in New Jersey have elected to require private schools accepting placements from public school districts to comply with the regulations providing procedural safeguards to disabled students. *See* N.J. Admin. Code § 6A:14-1.1(c) ("The rules in this chapter shall apply to all public and private education agencies providing publicly funded educational programs and services to students with disabilities."); *see also A.P. ex rel. S.P. v. Allegro Sch., Inc.*, No. 17-281, 2017 WL 4330363, at *5 (D.N.J. Sept. 29, 2017) (McNulty, J.) ("The New Jersey regulations do contemplate administrative proceedings against private entities involved with publicly funded educational programs."); *P.N. ex rel. J.N. v. Greco*, 282 F. Supp. 2d 221, 237 (D.N.J. 2003) (Debevoise, J.) ("New Jersey regulations implementing the IDEA are expressly made applicable to private entities providing publicly funded educational programs and services to students with disabilities.").

It is true, as Garden Academy argues, that "federal courts across the Nation have found that even when a private entity is the means of effectuating the mandate of the IDEA, public agencies retain responsibility for ensuring that IDEA standards are upheld, and the private school itself is not liable for any violations of IDEA." (Garden Academy Moving Br. 13.) According to one district court, "[w]ith the exception of the District of New Jersey, every court to have considered the issue has concluded that the IDEA does not apply to private schools because private schools are not a 'State educational agency, State agency, or local educational agency.'" *McElroy v. Pacific Autism Ctr. for Educ.*, No. 14-04118, 2016 WL 3029782, at *11 (N.D. Cal. May 27, 2016) (Koh, J.) (citing *St. Johnsburg Acad. v. D.H.*, 240 F.3d 163, 171-72 (2d Cir. 2001); *Ullmo*

*v. Gilmour Acad.*, 273 F.3d 671, 679 (6th Cir. 2001)). But as Judge Koh noted, when applying the IDEA to private schools, the District of New Jersey has "found that New Jersey state law requires that all private schools comply with the IDEA." *Id.* (citing *P.N.*, 282 F. Supp. 2d at 234).

Furthermore, even if, as other federal courts have found, Congress did not make the IDEA applicable to private schools, district courts within the Third Circuit and the Third Circuit itself have held that "the IDEA incorporates heightened state educational standards." *John T. ex rel. Paul T. v. Delaware Cnty. Intermediate Unit.*, No. 98-5781, 2000 WL 558582, at *4 (E.D. Pa. 2000), *aff'd*, 318 F.3d 545 (3d Cir. 2003). In *John T.*, the Third Circuit found that while "[t]he IDEA, itself, does not mandate" that certain publicly funded special education service providers in Pennsylvania "provide . . . services to disabled children who voluntarily attend private schools," *John T.*, 318 F.3d at 549 n.3, "the obligations imposed upon [these providers] by the Pennsylvania [s]tatutes are incorporated into the IDEA." *Id.* The Third Circuit noted that "[i]ndeed, this [c]ourt, along with many other courts, has interpreted [20 U.S.C. § 1401(9)(B)] to incorporate heightened [state educational agency] requirements that are consistent with federal law." *Id.*; *see also* 20 U.S.C. § 1401(9)(B) (providing that "the term 'free appropriate education' means special education and related services . . . that meet the standards of the [s]tate educational agency"). Accordingly, the Third Circuit held that the provider was subject to an IDEA enforcement action and could be ordered to comply with Pennsylvania's heightened special education standards. *John T.*, 318 F.3d at 552 (holding that the district court did not err in finding that the publicly funded special education provider failed to comply with Pennsylvania's heightened educational requirements); *see also Michael C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 652 (3d Cir. 2000) ("federal law incorporates state standards, and a school district may violate the IDEA if it fails to satisfy the more stringent state law requirements").

Similarly, in the case at bar, where New Jersey's state educational agency has imposed heightened state educational standards on private schools compared to those imposed by the IDEA, those regulations are incorporated into the IDEA and enforceable against the private school. The Parents are permitted to enforce these heightened standards in federal court, so long as the heightened standards are consistent with federal law. New Jersey's version of the "stay-put" rule, New Jersey's regulations controlling the IEP amendment procedures, and the regulations that make these regulations applicable to private schools are heightened educational standards enforceable against private schools in federal IDEA actions.

## B.   The ALJ's Factual Determinations

When considering New Jersey's stay-put provision, federal courts interpret the State's provision in a manner similar to the federal provision. "[T]he provisions of [N.J. Admin. Code. §] 6A:14-2.7(u) . . . have the same meaning as the language of 20 [U.S.C. § 1415]. In essence, the New Jersey regulatory provision cited by Plaintiffs requires the same stay put requirement as the IDEA." *R.K*, 2016 WL 4443165, at *4 (internal quotation marks and citations omitted). In construing the IDEA's stay-put provision, the Third Circuit has held that "[t]he stay-put provision protects the status quo of a child's educational placement by preventing school districts from effecting unilateral change in a child's educational program." *R.B.*, 532 F. App'x at 139-40 (internal quotation marks and citations omitted). The Third Circuit "look[s] to a student's existing IEP to determine a child's 'then-current educational placement' (or the 'status quo') and whether a school has implemented a change from that IEP." *Id.* at 140.

Consistent with the Third Circuit's interpretation of the federal stay-put protection, the ALJ looked to B.M.'s last Garden Academy IEP, the March 2009 IEP. (ALJ Op. JA20.) After considering witness testimony, the documentary record, and Garden Academy's arguments to the

14

contrary, the ALJ concluded that "the last-agreed-upon IEP between the parties clearly set out that home visits were to occur 'once weekly by B.M.'s teacher or teacher's aide' for 'home parent training.'" (*Id.*) Once again, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270.

Here, after carefully considering the ALJ's opinion, the record before the OAL, and the parties' submissions to the Court, the Court finds that Garden Academy has not met its burden of challenging the ALJ's determination that the IEP included "once weekly" home visits as a component of Garden Academy's home programming. Based on its own review of the record, the Court agrees with the ALJ's determination. The record before the Court suggests that as early as his first year at Garden Academy during the 2007-08 school year, B.M.'s "teacher came out to the house once a week to work with B.M. to generalize his skills in areas such as toilet training and lessons. During his second year, 2008-09, his teacher . . . came out more often, sometimes as much as three times a week." (ALJ Op. JA18 (citing S.M. Dec. 17, 2018 Hr'g Tr. 22:3-23:17); *see also* ALJ Op. JA16 (describing testimony from Sinning, who "identified home-programming logs . . . which showed that the programming for B.M. occurred in various places, including his home during the 2007-08 year").) It is undisputed that on April 7, 2008, the Parents and other members of the IEP Team enacted an IEP whose text provided that B.M. was to receive "home visits." (*See* PSMF ¶ 17 (quoting Apr. 7, 2008 IEP JA610); GARPSMF ¶ 17.) The text of the March 26, 2009 IEP similarly provides for "once weekly visits by either B.M.'s teacher or teacher's aide" for "approximately two hours," (ALJ Op. JA12 (quoting Mar. 26, 2009 IEP JA344); PSMF ¶ 18; GARPSMF ¶ 18), suggesting that the IEP intended for the previous years' home visits to continue. Accordingly, the Court will affirm the ALJ's factual finding that the "home programming" provided for in B.M.'s IEP required home visits.

It is undisputed that Garden Academy made the decision "to cease providing a home program to B.M. in the summer or early fall of 2009 . . . without involving B.M.'s local school district." (PSMF ¶ 52; GARPSMF ¶ 52; ALJ Op. JA13); *but see* N.J. Admin. Code § 6A:14-7.5(b)(1)(i) (providing that "[t]he IEP of a student placed in a receiving school shall be amended by only the IEP team of the district board of education.").[4] The Court has already found that the IDEA permits the Parents to enforce this regulation in a federal court action against Garden Academy. The Court, accordingly, affirms the ALJ's determination that "Garden [Academy] changed the terms of B.M.'s 2009-10 IEP by eliminating the mandated once-weekly home visits. It did so without input from Marlboro and without attention to the requirements for amending a child's IEP as set forth in New Jersey regulations governing special education." (ALJ Op. JA27.)

## C.    The ALJ's Compensatory Education Award

The ALJ went on to conclude that "[t]he circumvention of Marlboro, the school district, and the IEP process, along with the failure to validly obtain the consent of the parents," demonstrates "that the IEP was not changed and the requirement in the last-agreed-upon IEP that weekly home visits must occur remained in place during the 2009-10 school year and the period of stay-put." (*Id.* at JA28.) The ALJ found that B.M. should have been provided weekly home visits until the stay-put period expired in September 2011. (*Id.* at JA31 ("As B.M. was deprived of the weekly visits to his home by Garden [Academy] staff that were set forth in his IEP, an award of compensatory education is appropriate for the services denied from August 2009 through the end of stay-put in September 2011."). Accordingly, the ALJ awarded the Parents 223.6 hours of therapy services as compensatory education. Garden Academy argues that even assuming it failed

---

[4] The Court has already found that "Garden Academy is a receiving school, which includes 'approved private schools for students with disabilities.'" *S.M.*, 2013 WL 2405438, at *4 (quoting N.J. Admin. Code § 6A14-7.1(a)).

16

to provide 223.6 hours of home visits, "the ALJ erred in mechanically awarding a one-for-one compensatory education remedy with no analysis of whether it was necessary, nine years later, to make B.M. whole for any deprivation he may have suffered." (Garden Academy Moving Br. 37 (citing *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 605-08 (M.D. Pa. 2014)).)

The ALJ's compensatory education award is "subject to plenary review as [a] conclusion[] of law." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). The Third Circuit has held that "courts, in the exercise of their broad discretion, may award [compensatory education] to whatever extent necessary to make up for the child's lost progress and to restore the child to the educational path he or she would have traveled but for the deprivation." *G.L.*, 802 F.3d at 625. While the Court affirms the ALJ's determination that Garden Academy violated the stay-put rule, based on its review of the record and the ALJ's opinion, the Court cannot agree that the ALJ's compensatory education award was granted to the extent necessary to make up for B.M.'s lost progress. The ALJ awarded these hours almost a decade after Garden Academy unilaterally deprived B.M. of weekly home visits. The ALJ's opinion, however, makes no findings regarding lost educational progress from ten years ago that can be compensated for with an educational award today. *Compare with A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, 2016 WL 6216093, at *9 (M.D. Pa. Oct. 25, 2016) ("the evidence clearly demonstrates that A.W. requires compensatory education in the form of psychological therapy services to make up for lost progress"). Accordingly, the Court cannot agree that a compensatory education award of 223.6 hours is supported by the record.

As noted above, however, the ALJ found that "once the home visits had ceased, [the Parents] were forced to seek services from an agency, and presented an invoice from Rainbow

17

Consulting for the costs that they had incurred from October 2009 through December 2010 in the amount of $19,300." (ALJ Op. JA19-20; *see also* GASMF ¶ 44; PRGASMF ¶ 44.) "By its plain terms, the IDEA does not limit the type of relief a court may order, so long as that relief is 'appropriate.'" *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 184 (3d Cir. 2009). "The district court is authorized to grant 'such relief as the court determines is appropriate,' including attorneys' fees, reimbursement for a private educational placement, and compensatory education." *A.W. v. Jersey City Public Schs.*, 486 F.3d 791, 802 (3d Cir. 2007) (quoting 20 U.S.C. § 1415(i)(3)(B)(i)) (collecting cases). Accordingly, rather than award 223.6 hours of compensatory education, the Court will order Garden Academy to reimburse the Parents for their $19,300 in out-of-pocket costs paid to Rainbow Consulting.[5]

## D.  Attorneys' Fees

The Parents' Summary Judgment Motion also sought to "obtain all the attorney's fees and costs incurred, compensatory education services[,] and any other relief that has been or could be awarded by the Federal District Court." (ECF No. 15.) The Parents' Moving Brief, however, clarifies that "if the Parents' Motion for Summary Judgment is granted . . . as the 'prevailing parties' pursuant to the IDEA, the Parents do intend to file Post-Judgment Motions with this Court,

---

[5] The Parents also argue that the ALJ "should not have limited [the] award to mere calculation of make-up hours, when B.M. was entitled to much, much more relief." (Parents' Moving Br. 33.) "In this regard, we would also urge this Court to be mindful of the suffering that B.M. endured." (*Id.* at 34.) They argue that the record demonstrates that "B.M. truly suffered regression after Garden Academy ceased providing home programming in the home and the community after the Summer of 2009." (*Id.* at 35.) The Court notes, however, "that compensatory and punitive damages are not [an] available remedy under the IDEA." *Chambers*, 587 F.3d at 184-85. The IDEA's "language and structure make plain that Congress intended to ensure that disabled children receive a FAPE under appropriate circumstances, not to create a mechanism for compensating disabled children and their families for their pain and suffering where a FAPE is not provided." *Id.* at 186. Accordingly, to the extent the Parents seek to obtain "greater relief than that which was provided for" by the ALJ's opinion on the grounds of pain and suffering, (*see* ECF No. 15), that request is denied.

18

as is their right." (Parents' Moving Br. 10.) In those post-judgment motions, the Parents "intend to seek and, if they prevail, should be awarded attorney's fees and costs based upon the lengthy proceedings." (*Id.*) To the extent the Parents seek attorneys' fees in the Motion for Summary Judgment now before the Court, that request is denied without prejudice as to the Parents' ability to seek attorneys' fees in post-judgment motions.

## IV.  CONCLUSION

For the reasons set forth above, the Court will affirm the ALJ's decision in part and reverse in part. The Parents' Motion for Summary Judgment is granted in part and denied in part. Garden Academy's Motion for Summary Judgment is denied. The Court will enter an Order consistent with this Memorandum Opinion.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**